## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Datalink Corporation,<br><br>        Plaintiff,<br><br>v.<br><br>Perkins Eastman Architects, P.C.,<br><br>        Defendant. | Case No. 13-cv-2978 (SRN/HB)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Amanda J. Rome, Michael F. Cockson, and Staci L. Perdue, Faegre Baker Daniels LLP, 90 South 7th Street, Suite 2200, Minneapolis, MN 55402-3901, for Plaintiff.

Kyle A. Eidsness and Douglas J. McIntyre, Foley & Mansfield, PLLP, 250 Marquette Ave, Suite 1200, Minneapolis, MN 55401, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Summary Judgment [Doc. No. 38].  For the reasons set forth below, the Court grants, in part, Plaintiff's motion.

## II.     BACKGROUND

Plaintiff Datalink Corp. ("Datalink") brought this suit against Defendant Perkins Eastman Architects, P.C. ("Perkins Eastman") alleging breach of contract and unjust enrichment.  (See Notice of Removal, Ex. A, "Compl." ¶¶ 16–27 [Doc. No. 1-1].)  Datalink is a "data center solutions company that provides information technology services."  (See id. ¶ 2.)  Perkins Eastman is an international planning, design, and

consulting firm with multiple offices in the United States and around the world.  (See id. ¶ 3.)

In early 2012, Alan Ho, Perkins Eastman's Senior Associate Director, Systems, and Kim Lam, Associate Principal Director, Technology, contacted a North Carolina corporation, StraTech, regarding issues with Perkins Eastman's data backup solution. (See Aiello Decl. ¶ 2 [Doc. No. 13].)  Over the course of the following few months, the parties analyzed Perkins Eastman's backup system, and StraTech ultimately recommended replacing it with Symantec NetBackup ("NBU") and Symantec NBU appliances.  (Id.)

In October 2012, StraTech was acquired by Datalink.  (Id. at ¶ 3.)  At that time, Datalink's New York-based account executive, John Aiello, presented an overview of the company to Ho and Kim, and explained that Datalink was headquartered in Minnesota, where its operations were also managed.  (Id.)  Subsequent to that meeting, Perkins Eastman decided to follow Datalink's recommendation to replace their legacy data backup system with Symantec NBU and NBU appliances.  On December 27, 2012, Lam sent a signed Purchase Order to that effect to Aiello via e-mail, who then forwarded it to Datalink headquarters in Minnesota for processing.  (Id. at ¶¶ 5, 6.)

Upon receipt of the Purchase Order, Datalink obtained the various hardware, software, and personnel resources needed to complete the project, confirmed Defendant's creditworthiness, and began ordering the necessary equipment and pre-configuring it based on specifications provided by Defendant.  (Id. at ¶¶ 7, 8, 10, 11.)  After the NBU appliances were configured, Datalink warehouse employees re-packaged and shipped the

hardware from Minnesota to Perkins Eastman's data center locations across the United States in early March 2013.  (Id. at ¶ 11.)  Datalink also sent invoices to Defendant totaling $761,849.06.  (See Compl., Ex. E, "Invoices" [Doc. No. 1-1].)

According to the President and COO of Perkins Eastman, J. David Hoglund, when the NBU appliances arrived to Defendant's office locations, several of the boxes were opened and one of the appliances was installed.  (See Hoglund Dep. 60:17–22, 73:19–25, Jan. 26, 2015 [Doc. No. 41-1].)

Defendant contends that Lam lacked actual and apparent authority to sign the purchase agreement for the NBU equipment.  (See Def.'s Mem. at 3 [Doc. No. 46].)  In fact, Perkins Eastman contends that its "Board of Directors was unaware of the signed [P]urchase [O]rder until Lam revealed he had signed an agreement in an email to [President] David Hoglund on April 25, 2013."  (See id. at 4) (citing McIntyre Decl., Ex. F, "Emails Between Lam and Hoglund" [Doc. No. 48-6]).  On May 13, 2013, Defendant informed Plaintiff that it no longer wanted the NBU equipment.  (See Cockson Decl., Ex. Q, "Email from Frank Giannelli to John Aiello" [Doc. No. 41-17]; Hoglund Dep. 134:25–135:14 [Doc. No. 41-1].)  Perkins Eastman subsequently refused to pay any of the invoices sent by Datalink for work performed under the NBU Purchase Order. (Compl. at ¶ 13 [Doc. No. 1-1].)

The purchase agreement between Datalink and Symantec prohibited Datalink from reselling used Symantec equipment.  (See Rome Decl. Ex. F, "Symantec Agreement" § 2.3(vi) (stating that "[r]eseller shall not . . . resell the Symantec Offerings to Individuals or entities other than the applicable End User [Perkins Eastman] for which such items

were ordered.") [Doc. No. 50-1]; Westenfield Dep. 100:4–19 [Doc. No. 41-2].)  Although the NBU equipment could not be resold, the contract did not prohibit Symantec from accepting returned hardware and software.  Ultimately, Symantec agreed to refund the NBU software and related costs, but it did not accept return of the hardware.  (See id. at 52:10–15, 95:19–96:2.)  Accordingly, Symantec credited Datalink $276,721.34 for the software, maintenance, and training credits.  (See Cockson Decl., Ex. R, "Symantec Credit" [Doc. No. 41-18].)  Perkins Eastman remains in possession of the NBU hardware, and has refused to pay for the goods and services delivered.  (See Hoglund Dep. 210:18– 211:2 [Doc. No. 41-1]; Cockson Decl., Ex. S, "Def.'s Resp. to Pl.'s Requests for Admission" at 3–4 [Doc. No. 41-19].)  Defendant contends that the terms of the NBU contract are ambiguous.  Specifically, Perkins Eastman argues that because there was no signed statement of work ("SOW"), Plaintiff cannot hold Defendant liable for the unpaid invoices.  (See Def.'s Mem. at 4 [Doc. No. 46].)

After Datalink was unsuccessful in collecting the past-due amounts from Perkins Eastman, Plaintiff commenced this action in Minnesota state court in September 2013.  In Count I, Plaintiff alleges that Defendant breached the contract between the parties by failing to pay the delinquent balance of $761,849.06, in addition to interest, fees, and costs associated with collecting these amounts.  (See Compl. ¶ 19 [Doc. No. 1-1].)  Although no signed SOW exists between the parties, Plaintiff claims that the Purchase Order between Datalink and Perkins Eastman constitutes an enforceable, written contract.  (See id. ¶ 17.)  In Count II, Plaintiff alleges that Defendant was unjustly enriched because it received a significant benefit for which it had not paid.  (See id. ¶ 23.)  Datalink

4

explains that "it would be inequitable and unjust for Perkins Eastman to retain the benefit of Datalink's goods and services without paying." (See id. ¶ 26.)  On October 30, 2014, Perkins Eastman removed the action to this Court on diversity grounds. (See Notice of Removal [Doc. No. 1].)  Plaintiff filed its Motion for Summary Judgment on February 6, 2015 [Doc. No. 38].  In support of its motion, Datalink filed a memorandum [Doc. No. 40], a declaration [Doc. No. 41], and numerous exhibits, including deposition transcripts, emails, invoices, and letters exchanged between the parties.  On February 27, 2015, Defendant filed its response brief [Doc. No. 46], a declaration and several supporting exhibits [Doc. No. 48].  Plaintiff filed its reply on March 13, 2015 [Doc. No. 49].  The Court heard oral argument on Plaintiff's motion on March 20, 2015.

## III.   DISCUSSION

### A. Standard of Review

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp., 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Id. at 323.  However, "a party opposing a

properly supported motion for summary judgment may not rest upon mere allegation or

denials of his pleading, but must set forth specific facts showing that there is a genuine

issue for trial." Anderson, 477 U.S. at 256. "Only disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of

summary judgment. Factual disputes that are irrelevant or unnecessary will not be

counted." Id. at 248. Moreover, summary judgment is properly entered "against a party

who fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial."

Celotex Corp., 477 U.S. at 322. Plaintiff moves for summary judgment on both its

breach of contract and unjust enrichment claims. Both claims are discussed in detail

below.

### B.      Count I: Breach of Contract

Under Minnesota state law, Datalink must prove the following four elements to

succeed on its breach of contract claim: (1) a contract was formed, (2) the plaintiff

performed the conditions precedent, (3) the defendant breached the contract, and (4)

damages resulted from the defendant's breach. See Thomas B. Olson & Assocs., P.A. v.

Leffert, Jay & Polglaze, P.A., 756 N.W.2d 907, 918 (Minn. Ct. App. 2008), review

denied (Minn. Jan. 20, 2009); Border State Bank of Greenbush v. Bagley Livestock

Exchange, Inc., 690 N.W.2d 326, 335–36 (Minn. Ct. App. 2004), review denied (Minn.

Feb. 23, 2005).[1]

---

[1]      "A federal court sitting in diversity must apply the choice of law principles of the
state in which it sits, in this case Minnesota." Fla. State Bd. of Admin. v. Law Eng'g &

Plaintiff contends that no genuine issue of material fact exists about the aforementioned elements of its breach of contract claim.  Additionally, Datalink argues that Defendant has failed to raise a fact issue as to whether Perkins Eastman is entitled to a rescission defense.  The Court agrees, and grants Plaintiff's Motion for Summary Judgment with respect to Defendant's liability for Plaintiff's Count One.

### 1.  Formation of Contract

As to the formation of the contract, Defendant argues that substantial uncertainty exists about the scope of the work because the parties did not sign a SOW.  (See Def.'s Mem. at 7 [Doc. No. 46].)  Perkins Eastman claims that the lack of a signed SOW demonstrates "Defendant's reluctance to consummate a deal in writing."  (See id.)  The Court disagrees, and finds that no genuine issue of material fact exists as to whether the parties formed a contract.  See Thomas B. Olson & Assocs., P.A., 756 N.W.2d at 918.

"Summary judgment is 'inappropriate where terms of a contract are at issue and those terms are ambiguous or uncertain.'"  Toll Bros. v. Sienna Corp, No. 06-cv-4378 (DSD/JJG), 2008 WL 2986685, at *3 (D. Minn. July 30, 2008) (quoting Bank Midwest, Minn., Iowa, N.A. v. Lipetzky, 674 N.W.2d 176, 179 (Minn. 2004)).  "The construction and effect of a contract" is a question of law, "unless the contract is ambiguous." Denelsbeck v. Wells Fargo & Co., 666 N.W.2d 339, 346 (Minn. 2003).  "Where there is a written instrument, the intent of the parties is determined from the plain language of the

---

Envtl. Servs., Inc., 262 F. Supp. 2d 1004, 1010 (D. Minn. 2003) (citing Fuller v. Hartford Life Ins. Co., 281 F.3d 704, 707 (8th Cir. 2002)); (see generally 7/16/14 Order (holding that the Court properly sits in diversity jurisdiction and has personal jurisdiction over the parties in this case) [Doc. No. 18]).

instrument itself." Travertine Corp. v. Lexington-Silverwood, 683 N.W.2d 267, 271

(Minn. 2004). "'A contract is ambiguous if, based upon its language alone, it is

reasonably susceptible of more than one interpretation.'" Denelsbeck, 666 N.W.2d at

346 (quoting Art Goebel, Inc. v. N. Suburban Agencies, Inc., 567 N.W.2d 511, 515

(Minn. 1997)). "Basic contract principles instruct that '[w]here a writing refers to

another document, that other document, or the portion to which reference is made,

becomes constructively a part of the writing, and in that respect the two form a single

instrument. The incorporated matter is to be interpreted as part of the writing.'" Halbach

v. Great-W. Life & Annuity Ins. Co., 561 F.3d 872, 876 (8th Cir. 2009). Even a mere

reference, within a signed document, to an unsigned document is "sufficient as a legal

matter to incorporate the attached [document]." Id.

 Here, a signed, unambiguous written instrument exists between the parties. See

id.; Travertine Corp., 683 N.W.2d at 271. On behalf of Perkins Eastman, Lam, signed a

Purchase Order with Datalink for the NBU Project. (See Rome Decl., Ex. R, "Purchase

Confirmation and Approval" [Doc. No. 50-1].) According to the Purchase Order, the

parties agreed that Datalink would install Symantec NBU hardware and software, and

that Datalink would provide training for the NBU equipment. (See id. at 1.) The

agreement also references, and thus incorporates, an earlier SOW that was initially

created between StraTech and Perkins Eastman. (See id. at 3) (referencing "SOW #14");

Halbach, 561 F.3d at 876.

 The fact that the StraTech SOW between the parties was unsigned has no legal

significance. Because the Purchase Order was signed, and it referenced the StraTech

SOW, that reference alone is sufficient to legally incorporate the StraTech SOW.  See id.

Also, as Plaintiff correctly notes, it is irrelevant that the SOW, "bears the name StraTech

rather than Datalink."  (See Pl.'s Reply at 19 [Doc. No. 49].)  Once Datalink acquired

StraTech in 2012, Datalink assumed StraTech's duties and obligations, including those

set forth in the Purchase Order and the incorporated SOW. [2]  (See Westenfield Dep.

28:1–9 [Doc. No. 41-2]); Minn. Stat. § 302A.661, subd.4 (stating that "transferee is liable

for the debts, obligations, and liabilities of the transferor only to the extent provided in

the contract or agreement between the transferee and transferor or to the extent provided

by this chapter or other statutes of this state.") (2015).  Therefore, it is immaterial that the

SOW incorporated into the Purchase Order was unsigned and bears StraTech's name.

       Once Datalink began to work directly with Perkins Eastman, the parties created

four successive, updated versions of the SOW.  (See Rome Decl., Exs. G, H, I, J

"Datalink SOWs" [Doc. No. 50-1].)  Each of these versions of the SOW, however, did

not at all alter the NBU Project hardware and software requirements.  Because these

requirements were fixed in the signed Purchase Order, the portion of the SOWs that

summarized the hardware and software necessary for the project necessarily remained the

same.  (See id. § 2.1 "Scope Boundaries.")  Rather, the Datalink SOWs only fine-tuned

---

[2]       The Court also notes that even the specific individuals who negotiated the NBU
Project remained the same after Datalink acquired StraTech.  Prior to the acquisition,
Aiello of StraTech and Lam of Perkins Eastman were negotiating the NBU Project
contract.  (See Westenfield Dep. 26:23–28:9 [Doc. No. 41-2].)  After Datalink acquired
StraTech, Aiello and Lam continued negotiating the NBU Project contract, but Aiello
represented Datalink, rather than StraTech.  (See Cockson Decl., Ex. E, "Email from
John Aiello to Perkins Eastman" (stating that on Nov. 19, 2012, the parties planned to
discuss Datalink's acquisition of StraTech) [Doc. No. 41-5].)

the service component of the NBU Project.  (See generally id.)  Therefore, even if these successive SOWs adequately modified the StraTech SOW,[3] they did not alter the signed Purchase Order, and therefore, the material terms of the contract pertaining to the hardware and software requirements did not change.

Additionally, the Court notes that insofar as Defendant contends that the successive SOW drafts are evidence of a lack of mutual assent between the parties to agree to the NBU Project at all, the Court disagrees.  The parties clearly assented to the NBU Project by signing a Purchase Order, which incorporated the StraTech SOW. While the successive SOWs demonstrate that the parties continued to "fine-tune[] the project's service needs," that fine-tuning "is evidence, if anything, of an intent to *proceed* with the project," rather than evidence of a lack of agreement between the parties.  (See Pl.'s Reply at 6 (emphasis original) [Doc. No. 49].)  In fact, Perkins Eastman clearly intended to proceed with the project because Datalink even hosted a "Project Kickoff" with Defendant on February 14, 2013, about two months after the Purchase Order was signed.  (See Ho Decl., Ex. A, "Datalink Project Kickoff Presentation" [Doc. No. 15-1].) In sum, the Court holds that no genuine issue of material fact exists as to the existence of a binding contract, which required Plaintiff to deliver NBU equipment and provide training and service, and also required Defendant to pay for this equipment and service.

## 2.  Plaintiff Performed Conditions Precedent

The Court also finds that no genuine issue of material facts exists as to whether Plaintiff performed the conditions precedent set forth in the contract.  See Thomas B.

---

[3]      The Court discusses the issue of modification in detail in Part III(B)(4)(b).

Olson & Assocs., P.A., 756 N.W.2d at 918.  "A condition precedent 'is any fact or event,

subsequent to the making of a contract, which must exist or occur before a duty of

immediate performance arises under the contract.'"  Krogness v. Best Buy Co., Inc., 524

N.W.2d 282, 287 (Minn. Ct. App. 1994) (citing National City Bank v. St. Paul Fire &

Marine Ins. Co., 447 N.W.2d 171, 176 (Minn. 1989)).  In order to trigger Defendant's

obligation to pay for the goods and services, the contract between the parties required

Plaintiff to purchase the hardware and software from Symantec, deliver the equipment to

Perkins Eastman, and provide Perkins Eastman with relevant training for the NBU

Project.  (See Rome Decl., Ex. R, "Purchase Confirmation and Approval" [Doc. No. 50-

1].)

Datalink satisfied all of the required conditions above, but stopped short of

providing all of the hours of service it intended to provide because Perkins Eastman

informed Datalink, on May 13, 2013, that it no longer wanted to continue with the NBU

Project.  First, Datalink paid Symantec for the NBU Project equipment.  (See Westenfield

Dep. 56:19–57:1 [Doc. No. 50-1].)  By March 27, 2013, Datalink had also delivered all

of the NBU equipment to Perkins Eastman.  (See Hoglund Dep. 60:17–22; 73:11–18

[Doc. No. 40-1].)  Perkins Eastman does not dispute that Datalink delivered the NBU

Project equipment.  (See Cockson Decl., Ex. S, "Def.'s Resp. to Pl.'s Requests for

Admission" at 3 [Doc. No. 41-19].)  In fact, Perkins Eastman unpacked the equipment

and even partially installed it.  (See Hoglund Dep. 73:19–25; 210:18–211:2; Rome Decl.,

Ex. P, "Emails Between Douglas Hall and Alan Ho" [Doc. No. 50-1].)  By March 27,

2013, Datalink had rendered thirty hours of professional services, which amounted to

11

$7,734.88.  (See Pl.'s Reply at 13 n.5 [Doc. No. 49]; Cockson Decl., Ex. S, "Def.'s Resp. to Pl.'s Requests for Admission" at 3 [Doc. No. 41-19]; Hoglund Dep. 156:11–13; 210:18–211:2 [Doc. No. 41-1].)[4]  Therefore, no genuine issue of material fact exists as to whether Plaintiff performed the conditions precedent set forth in the contract.

### 3.  Defendant Breached the Contract

The Court also finds that no genuine issue of material fact exists as to whether Defendant breached the contract by failing to pay Plaintiff for the equipment delivered and services rendered.  See Thomas B. Olson & Assocs., P.A., 756 N.W.2d at 918. Perkins Eastman readily admitted in its Response to Plaintiff's Request for Admissions that although it had received invoices from Datalink relating the NBU Project, it has not paid Datalink for the goods and services that Datalink provided.  (See Cockson Decl., Ex. S, "Def.'s Resp. to Pl.'s Requests for Admission" at 4 [Doc. No. 41-19].)  Because the Purchase Order unambiguously binds Defendant to pay for the goods and services rendered by Datalink, Perkins Eastman clearly breached its contract with Datalink.  (See Rome Decl., Ex. R, "Purchase Confirmation and Approval" [Doc. No. 50-1].) Regardless of which SOW governs the relationship between the parties, the signed Purchase Order obligated Perkins Eastman to pay for the NBU equipment and training hours rendered by Plaintiff.  (See id.)  Therefore, the Court finds that no genuine issue of material fact exists as to whether Defendant breached the contract.

---

[4]     Although Datalink did not continue to provide training for Perkins Eastman after receiving an email from Frank Giannelli on May 13, 2013, which stated that Perkins Eastman no longer wanted the NBU equipment, Perkins Eastman had accepted Datalink's services until that point.

### 4.  Damages Resulted from Defendant's Breach

Plaintiff also contends that no genuine issue of material fact exists as to whether

damages resulted from Defendant's breach.  See Thomas B. Olson & Assocs., P.A., 756

N.W.2d at 918.  Summary judgment is inappropriate where damages are in dispute.  See

Textron Fin. Corp. v. Weeres Indus. Corp., No. 10-cv-2070 (JRT/LIB), 2011 WL

2682901, at *11 (D. Minn. June 17, 2011); Odens Family Props., LLC v. Twin Cities

Stores, Inc., 393 F. Supp. 2d 824, 830–31 (D. Minn. 2005) (holding that factual issues

precluded summary judgment on amount of damages).  The parties agree that the

Uniform Commercial Code ("UCC") governs this dispute because the predominant

purpose of the contract between the parties was for the sale of goods.[5]  (See Def.'s Mem.

at 16 [Doc. No. 46]; Pl.'s Reply at 10 [Doc. No. 49].)  Minnesota law dictates that

remedies provided by the UCC "must be liberally administered to the end that the

aggrieved party may be put in as good a position as if the other party had fully

performed."  See Minn. Stat. § 336.1-305(a) (2015).  The Court defers ruling on

---

[5]     Pursuant to the "predominant factor" test used by Minnesota courts to determine whether the UCC applies to a contract for mixed good and services, courts have primarily focused on the relative cost of the services compared to the cost of goods.  See Duxbury v. Spex Feeds, Inc., 681 N.W.2d 380, 386–87 (Minn. Ct. App. 2004); Valley Farmers' Elevator v. Lindsay Bros. Co., 398 N.W.2d 553, 556 (Minn. 1987) (classifying a transaction as a sale of goods where the labor cost was only $120,000 and the materials were more than $380,000) (overruled on other grounds); OneBeacon Ins. Co. v. Datalink Corp., No. A08-0992, 2009 WL 1311787, at *3 (Minn. Ct. App. May 12, 2009) (finding that the predominant purpose of a Datalink contract was for the sales of goods where the cost of goods outweighed the cost of services).  Here, the relative cost of goods ($650,000) far outweighs the cost of services ($55,000).  Therefore, the predominant purpose of the transaction was the sale of goods.

Plaintiff's motion as it applies to damages for Count I, and holds that additional briefing

is required to determine the precise amount of damages that Plaintiff is owed.

> **a. Datalink is Entitled to (1) the Full Contract Price of Goods and Services Rendered Because Perkins Eastman Accepted the Goods and (2) the Profit Margin on Software, Training, and Maintenance that was Returned to Symantec**

Pursuant to Minnesota law, a "buyer must pay at the contract rate for any goods

accepted." See Minn. Stat. § 336.2-607(1) (2015).  "Acceptance of goods results when

the buyer (1) after inspection signifies that the goods conform to the contract or that the

buyer will retain the goods notwithstanding nonconformity, (2) fails to make an effective

rejection after a reasonable opportunity to inspect the goods, or (3) acts inconsistently

with the seller's ownership." Larson v. Felix, No. A06-931, 2007 WL 1412906, at *2

(Minn. Ct. App. May 15, 2007) (citing Minn. Stat. § 336.2-606(1)).  Minnesota Statute §

336.2-602 clarifies that "[r]ejection of goods must be within a reasonable time after their

delivery or tender," and rejection is "ineffective unless the buyer seasonably notifies the

seller." See Minn. Stat. Ann. § 336.2-602(1) (2015).

Here, the record plainly shows that Datalink delivered goods that conformed to the

specifications in the contract.  Defendant has not presented any evidence that the NBU

Project equipment was non-conforming.  Insofar as Defendant argues that the goods

could not have been conforming absent a signed SOW, the Court disagrees.  As outlined

above, an unsigned SOW can be incorporated into a signed purchase order and both may

form the basis of a valid and binding contract.  Moreover, the Court notes that the

successive SOWs dealt with outstanding issues of professional services, but the hardware

14

and software requirements remained the same, because they were set forth in the signed Purchase Order.  (See Rome Decl., Exs. G, H, I, J "Datalink SOWs" [Doc. No. 50-1]; Pl.'s Reply at 6 n.2 [Doc. No. 49].)  Thus, the delivered equipment conformed to the requirements set forth in the binding Purchase Order.

Moreover, the record demonstrates that Perkins Eastman accepted the goods by unpacking the equipment, partially installing it, and keeping the equipment in its possession.  (See Hoglund Dep. 60:17–22; 73:19–25; 210:18–211:2 [Doc. No. 41-1]; Cockson Decl. Ex. P, "Email from Chris Micknowicz" (confirming that one piece of NBU equipment was "mounted") [Doc. No. 41-16]; Rome Decl., Ex. P, "Email from Douglas Hall" (confirming that NBU equipment arrived and asking whether he should "start to mount them") [Doc. No. 50-1]); see also Nw. Airlines, Inc. v. Aeroservice, Inc., 168 F. Supp. 2d 1052, 1054 (D. Minn. 2001) (explaining that "under Minnesota law a buyer accepts goods if he fails to explicitly reject them during a reasonable inspection period."); Hanson v. Hartmann, No. C3-00-160, 2000 WL 1577057, at *3 (Minn. Ct. App. Oct. 24, 2000) (holding that buyer accepted the goods when he received them, permitted their installation, and retained them).

Because Perkins Eastman accepted the NBU Project equipment, Datalink is entitled to the contract price set forth in the Purchase Order, not including the amount that Symantec credited Datalink for the returned software.  See Minn. Stat. § 336.2-607(1) (stating that "[t]he buyer must pay at the contract rate for any goods accepted"); Minn. Stat. § 336.2-709(a)(1) (stating that "[w]hen the buyer fails to pay the price as it becomes due the seller may recover . . . the price of (a) goods accepted."); see also Tapemark Co.

15

v. E-Z Cleaners, LLC, No. 10-cv-813 (SRN/TNL), 2012 WL 246053, at *6 (D. Minn.

Jan. 25, 2012) (holding that defendant formed valid contract with plaintiff by accepting

all of the units delivered, without objection, and reselling the vast majority of them);

Ames Eng'g Corp. v. Lighthouse Bay Foods, Inc., No. C6-99-372, 1999 WL 595393, at

*2 (Minn. Ct. App. Aug. 10, 1999) (same).

In its brief, Datalink argues that the contract price of the hardware accepted by

Perkins Eastman, including taxes and freight, is $330,033.22.  (See Pl.'s Mem. at 14

(citing invoices attached to Compl.) [Doc. No. 40].)  In addition to the NBU equipment,

Datalink also provided thirty hours of professional services for Perkins Eastman.  Those

services amount to $7,734.88.  (See id.)

Datalink also claims that it is entitled to an additional $72,835.01, which would

have been its profit on the software that was returned to Symantec.  (See id. at 14–15.)

Plaintiff explains that if it had not mitigated its damages by asking Symantec to accept

the returned software, then it would be entitled to the full contract price of the software,

which necessarily includes the profit margin.  (See id. at 15 (citing Minn. Stat. § 336.2-

709).)  Specifically, Datalink claims that it should "not be put in a worse position than if

[sic] it would have been had it not mitigated its damages – particularly where, as here, it

had no obligation to do so."  (See id.)  Thus, in sum, Plaintiff argues that it is entitled

$402,868.23.

### (i)      "Amended and Final Invoice" is a Settlement Offer

Defendant contends that the value of damages that Plaintiff is entitled to remains

an issue of material fact, because an "amended and final invoice" sent from Datalink to

Perkins Eastman demonstrates that the total amount in dispute is actually $367,789.73.

(See Def.'s Mem. at 9 [Doc. No. 46]; McIntyre Decl., Ex. K, "Datalink Letter" [Doc. No.

48-11].)  The document that Defendant refers to as the "amended and final invoice" is an

October 24, 2013 letter from the CFO of Datalink, Gregory Barnum, to David Hoglund,

the President of Perkins Eastman.  (See id.)  The letter requests Hoglund to "accept this

letter as [Datalink's] amended and final invoice" and states and that "[p]ayment in full

must be received by Friday, October 25th, 2013," and "[o]nce full payment . . . is

received and Symantec provides full credit for returned software all legal filings will be

removed."  (See id.)  The $367,789.73 amount requested by Datalink in this letter

explicitly subtracts credits that Perkins Eastman received for returning NBU software to

Symantec.  (See id.)

    Perkins Eastman contends that whether this "final invoice" modified the parties'

agreement is a question of material fact.  In opposition, Datalink argues that this

document is not in fact a final, accurate "invoice," but is rather a settlement agreement

that is inadmissible under Federal Rule of Evidence 408.  (See Pl.'s Reply at 15 [Doc.

No. 49].)  The Court agrees.

    According to Rule 408, a party may not use settlement negotiations to "prove or

disprove the validity or amount of a disputed claim."  See Fed. R. Evid. 408(a); see

Buffalo Wild Wings, Inc. v. Buffalo Wings & Rings, No. 09-cv-1426 (JRT/SER), 2011

WL 4537970, at *6 (D. Minn. Sept. 29, 2011) (relying on Fed. R. Evid. 408 and

prohibiting testimony about the parties' pre-suit settlement discussions).  "Rule 408

recognizes that the parties to litigation should be at liberty to discuss settlement without

concern that those discussions will be publicized as reflecting on the merits of the parties' respective positions." Moubry v. Kreb, 58 F. Supp. 2d 1041, 1043 n.1 (D. Minn. 1999).

Here, Plaintiff sent this letter to Defendant one month after initiating this lawsuit. The letter expressly stated that if Perkins Eastman paid $367,789.73 by October 24, 2013, "all legal filings w[ould] be removed." (See McIntyre Decl., Ex. K, "Datalink Letter" [Doc. No. 48-11].) It appears clear to the Court that offering to end a legal proceeding, which has already been initiated, on the condition of the acceptance of a set sum of money by a certain date, is the quintessence of a settlement offer. See Fiebelkorn v. IKON Office Solutions, Inc., 668 F. Supp. 2d 1178, 1187 n.7 (D. Minn. 2009) (explaining that a request from one party to another party to exchange payment for the abandonment of claims is a settlement offer barred by Fed. R. Evid. 408).

Moreover, even the President of Perkins Eastman characterized this October 2013 letter as part of the parties' "negotiations" to "resolve this [matter] promptly" and "avoid [further] litigation." (See Rome Decl., Ex. C, Giannelli Dep., Ex. 13 "Emails Between Hoglund and Giannelli" [Doc. No. 50-1].) During his deposition, Hoglund was asked about his email communications with Frank Giannelli, the Vice President of Datalink. Hoglund explained that he emailed with Giannelli about the October 2013 letter, and described the emails as pertaining to "resolving a financial settlement between the parties." (See Hoglund Dep. 216:7–17 [Doc. No. 41-1].) Therefore, even the President of Perkins Eastman classifies the letter as a tool used for settlement negotiations.

Defendant analogizes this case to C.J. Duffey Paper Co. v. Reger, in which the Minnesota Court of Appeals held that the trial court did not err in determining that the

letter in question "did not constitute an offer to compromise an actual dispute under [R]ule 408." See 588 N.W.2d 519, 525 (Minn. Ct. App. 1999).  However, C.J. Duffey Paper Co. is distinguishable because the letter in that case, which proposed to pay the appellee an amount that appellants undisputedly owed him at the time, was sent before either party had ever "directly asserted any claims against [the other party]."  See id. at 524.  Thus, technically, at the time the letter was sent, the parties did not have a dispute, and were not in active litigation.  In stark contrast, here, Datalink sent the settlement offer to Perkins Eastman one month after it had initiated this lawsuit.

Additionally, in C.J. Duffey Paper Co., the appellee sought to offer the letter as evidence of bad faith, rather than to establish the validity or existence of a claim or its amount.  See id. at 525 (finding that the letter was not "offered to establish the amount of [the appellee's] claim," and holding that "[b]ecause the letter did not constitute an offer of settlement and was offered neither as evidence of liability or damages, the trial court was not required to exclude it.")  Here, Perkins Eastman seeks to offer the "amended and final invoice" precisely to establish the validity of the damages amount.  Therefore, the Court disregards the October 2013 letter, and holds that the letter is not a basis to find a factual dispute about the amount of damages due in this case.  See Brogren v. Pohlad, 960 F. Supp. 1401, 1407 (D. Minn. 1997) (explaining that because "[e]vidence submitted in response to a summary judgment motion must be admissible," a letter, which was inadmissible under Fed. R. Evid. 408, was not considered by the court).

### (ii)     Plaintiff Sufficiently Mitigated its Damages

Defendant also argues that Plaintiff is not entitled to the full damages value it

seeks because Datalink did not sufficiently mitigate its damages with respect to the NBU

Project hardware.  (See Def.'s Mem. at 15 [Doc. No. 46].)  Defendant's argument is two-

fold.  First, Perkins Eastman claims that it is factually unclear whether Datalink even

attempted to return the NBU hardware to Symantec because Denise Westenfield, the

Vice President, Controller, and Chief Accounting Officer of Datalink, could not confirm

during her deposition whether Datalink asked Symantec if it would accept returned

hardware.  (See id.)  Second, Perkins Eastman contends that the existence, and therefore

application, of a partnership agreement between Datalink and Symantec, which

prohibited Datalink from reselling the hardware, is in question.  (See id. at 16.)

     As to Defendant's first argument about the significance of Westenfield's

deposition testimony, the Court finds Defendant's position meritless.  Although

Westenfield could not confirm "for a fact that Datalink did ask Symantec if it would take

the hardware back," (see Westenfield Dep. 97:2–4 [Doc. No. 41-2]), other undisputed

evidence in the record shows that Datalink did in fact inquire about the return of the NBU

hardware.  According to an email exchange between John Sorensen of Symantec and

Frank Giannelli of Datalink, Datalink asked Symantec about its willingness to accept

returned NBU hardware, and Symantec informed Datalink on October 28, 2013 that it

would "not refund the hardware."  (See Rome Decl., Ex. D, "Sorensen Email" [Doc. No.

50-1].)  Thus, Westfield's uncertainty about Datalink's mitigation efforts is immaterial

because the record demonstrates that Datalink asked Symantec if it would be willing to

accept the NBU hardware.

     As to the merits of Defendant questioning the existence and application of the

partnership agreement between Datalink and Symantec, the Court finds that this argument also fails.  Datalink's partnership agreement with Symantec expressly bars Datalink from reselling Symantec equipment to anyone other than the end user for which it was ordered.  (See Rome Decl. Ex. F, "Symantec Agreement" § 2.3(vi) (stating that "[r]eseller shall not . . . resell the Symantec Offerings to Individuals or entities other than the applicable End User [Perkins Eastman] for which such items were ordered.") [Doc. No. 50-1]; Westenfield Dep. 100:4–19 [Doc. No. 41-2].)  Therefore, neither the existence of the partnership agreement, nor its application is in question.  It is an undisputed issue of fact that the partnership agreement prohibited Datalink from mitigating its damages by reselling the NBU equipment.

Datalink significantly mitigated its damages by facilitating discussions between Perkins Eastman and Symantec.  These discussions resulted in a return of the NBU software, and reduced Datalink's damages by more than $276,000.  (See Cockson Decl. Ex. R, "Symantec Credit" [Doc. No. 41-18]; Rome Decl., Ex. E, "Datalink's Answers to Perkins Eastman's Interrogs." at 13–15 [Doc. No. 50-1].)  The Court also notes that it was difficult, if not impossible, for Datalink to further mitigate its damages with respect to the NBU hardware because the equipment was specially configured and designed for Perkins Eastman.  In fact, Datalink and Perkins Eastman both agree that the resale value of hardware was only ten to twenty percent of its original contract price.  (See Hoglund Decl. 75:1–8 [Doc. No. 41-1]; Cockson Decl., Ex. V, "Missling Correspondence" [Doc. No. 41-22].)

Moreover, the Court notes that it is unclear whether Plaintiff was required to

mitigate its damages, even to the extent that it did.  Although North Carolina law appears

to govern the Court's interpretation of the StraTech SOW,[6] Minnesota law governs the

Court's interpretation of the Datalink SOWs,[7] and Minnesota law also governs the

general contract law issues in this case, see Fla. State Bd. of Admin., 262 F. Supp. 2d at

1010.  Under Minnesota law, "after the breaching party has accepted the goods, the non-

breaching party has no duty to mitigate its losses by accepting return of the goods or

proactively repossessing the goods without permission."  See Land O'Lakes Purina Feed

LLC v. Jaeger, 976 F. Supp. 2d 1073, 1076 (S.D. Iowa 2013) (analyzing Minnesota UCC

law).  Here, Perkins Eastman accepted the NBU Project hardware and still maintains

possession of it.  Accordingly, under Minnesota law, Datalink had no duty to mitigate its

damages by accepting the return of the goods or proactively repossessing them.

However, under North Carolina law, "'an injured plaintiff, whether his case be tort

or contract, must exercise reasonable care and diligence to avoid or lessen the

consequences of the defendant's wrong.'"  United Labs., Inc. v. Kuykendall, 403 S.E.2d

104, 108 (N.C. Ct. App. 1991) (quoting Watson v. Storie, 300 S.E.2d 55, 58 (N.C.

1983)), aff'd on other grounds, 437 S.E.2d 374 (N.C. 1993); see also Sylva Shops Ltd.

P'ship v. Hibbard, 623 S.E.2d 785, 789–90 (N.C. Ct. App. 2006).  Therefore, if North

---

[6]     The StraTech SOW states that "this document shall be governed by and construed in accordance with the internal substantive and procedural laws of the State of North Caroline without regard to conflict of law principles.  (See Hoglund Dep., Ex. 22 "StraTech SOW" at PE_00320 [Doc. No. 41-1].)

[7]     The Datalink SOWs state that "[t]he validity, interpretation, enforceability, and performance of this agreement shall be governed by and construed in accordance with the law of the State of Minnesota without reference to provisions concerning conflicts of law."  (See Rome Decl., Ex. S, "Datalink Terms and Conditions" § 14 [Doc. No. 50-1].)

Carolina law governs the issue of mitigation in this case, then Plaintiff may in fact have had a duty to mitigate its damages.

Regardless of which state law applies to Plaintiff's duty to mitigate damages, the Court finds that Plaintiff sufficiently mitigated its damages, and no genuine issue of material fact exists about whether, and to what extent, Datalink mitigated its damages.

Accordingly, the Court holds that a genuine issue of material fact does not exist with respect to (1) the contract price for goods and services rendered, and (2) the additional profit margin on software, training, and maintenance to which Plaintiff is entitled. Therefore, the Court finds that Datalink is entitled to $402,868.23, the amount it would have received had Perkins Eastman performed, not including the Symantec software credit.

### b. Late Charges

Plaintiff is additionally entitled to a late fee from Defendant. Regardless of which SOW applies – the StraTech SOW that was initially incorporated into the Purchase Order, or any of the Datalink SOWs – all of the SOWs include contractual provisions that provide for a late fee if payment is delinquent. (See Hoglund Dep., Ex. 22, "StraTech SOW" at PE_00319 (emphasis added) [Doc. No. 41-1]; Rome Decl., Ex. S, "Datalink Terms and Conditions" § 3 [Doc. No. 50-1].)

A late fee provision in the Terms and Conditions in the StraTech SOW states that:

> Undisputed invoices unpaid by Customer after thirty (30) days of the invoice date will bear interest at the *lower* of either (a) the rate of one and one-half percent (1.5%) per month calculated monthly or (b) highest rate permitted by applicable law.

23

(See Hoglund Dep., Ex. 22, "StraTech SOW" at PE_00319 (emphasis added) [Doc. No. 41-1].)  The SOW also states that "this document shall be governed by and construed in accordance with the internal substantive and procedural laws of the State of North Carolina without regard to conflict of law principles."  (See id. at PE_00320.)

Similarly, each version of the Datalink SOW incorporates Terms and Conditions (see Rome Decl., Exs. G, H, I, J "Datalink SOWs" at 2 (Confidentiality Statement) [Doc. No. 50-1]) that include a late fee provision, which states that "Datalink reserves the right to charge a late payment charge not to exceed one and one-half percent (1.5%) per month or the maximum amount permitted by law, whichever is less, on all invoices that remain unpaid thirty (30) days from invoice due date."  (See Rome Decl., Ex. S, "Datalink Terms and Conditions" § 3 [Doc. No. 50-1].)  However, in contrast to the StraTech SOW, which applies North Carolina law, the Terms and Conditions for the Datalink SOWs provide that "[t]he validity, interpretation, enforceability, and performance of this agreement shall be governed by and construed in accordance with the law of the State of Minnesota without reference to provisions concerning conflicts of law."  (See id. § 14.)

Plaintiff claims that the StraTech SOW governs because it was incorporated into the signed Purchase Order.  (See Pl.'s Mem. at 15 [Doc. No. 40].)  Plaintiff contends that it is entitled to the 1.5% interest rate set out in the Terms and Conditions, but also argues that, in the alternative, it is entitled to a prejudgment interest rate of 10% per year, pursuant to Minnesota law.  (See id. at 16 n.3.)  However, Datalink fails to address whether the choice of law provision in the StraTech SOW demonstrates that the relevant comparison should be with North Carolina law, as opposed to Minnesota law.  Moreover,

even applying the 1.5% interest rate, Datalink does not carefully lay out its calculation of the ultimate damages award it believes Perkins Eastman must pay.  Specifically, it is unclear to the Court what portion of the total $402,868.23 sum began to accrue interest at what time, since Datalink sent several invoices for goods and services rendered at different times, and interest only begins accruing 30 days from the date the invoice is due.

In contrast, Defendant argues that "[t]o the extent an SOW is applicable . . . the most recent version of the unsigned SOWs applies."  (See Def.'s Mem. at 14 (emphasis original) [Doc. No. 46].)  However, Defendant provides no briefing on which interest rate applies even if the most recent Datalink SOW governs – specifically, whether the 1.5% interest rate applies, or whether the "maximum amount permitted by [Minnesota] law" applies.  Also, like Datalink, Perkins Eastman does not provide any calculations of the ultimate damages award it believes Datalink is due, given the applicable late fee.[8]

The Court orders further briefing about which SOW governs the parties' contractual agreement.  Specifically, the Court requires further briefing on whether the parties mutually assented to the Datalink SOWs, and thus adequately modified the StraTech SOW.  In order for the parties to have formed an enforceable contract with

---

[8]     Insofar as Perkins Eastman argues that "there is no basis on this record to conclude that Defendant agreed to [any of] the late charges or fees provisions" (see Def.'s Mem. at 9 [Doc. No. 46]), the Court disagrees.  Lam signed the Purchase Order on behalf of Perkins Eastman, and the Purchase Order expressly incorporated the StraTech SOW, which included a late charge provision.  Therefore, at the very least, Defendant clearly agreed to the late fee provision in the StraTech SOW because it was encompassed by the Purchase Order.

these subsequent SOW drafts, the parties must have objectively manifested mutual assent.  See Markmann v. H.A. Bruntjen Co., 81 N.W.2d 858, 862 (Minn. 1957) (explaining that Minnesota law follows the objective theory of contract formation, requiring an outward manifestation of assent); Cederstrand v. Lutheran Bhd., 117 N.W.2d 213, 221 (Minn. 1962) (explaining that "[e]xpressions of mutual assent, by words or conduct, must be judged objectively, not subjectively.")

Under the Minnesota statute of frauds, usually, a signed, written agreement must exist to enforce the sale of goods valued over $500.  See Minn. Stat. § 336.2-201(1) (2015).  However, a "contract" that is neither written nor signed, is still considered valid and enforceable if the goods are specially manufactured for the buyer and not suitable for sale to others in the ordinary course of business, or if the goods have been received and accepted.  See id. § 336.2-201(3).  Here, the sale of goods is valued well over $500, but the goods were specially configured for Perkins Eastman, and were received and accepted by Defendant after they were delivered.  (See supra Part III(B)(4)(a).) Therefore, under the statute of frauds, if the Datalink SOWs were mutually assented to, they may constitute "contracts" that qualify as exceptions to the written and signed requirement, and thus may have legally modified the StraTech SOW.

Accordingly, the Court orders the parties to further brief: (1) which SOW governs the contractual relationship at issue in this case; (2) which "applicable" state law controls in this case for calculating late fees due under the contract; (3) which appropriate late fee to apply (whether the 1.5% rate set out in the contract, or the "highest rate permitted by applicable law"); and (4) the ultimate damages award that results from the applicable late

fee.  The Court emphasizes that the parties *must* limit their briefing to these sub-issues for

the sole purpose of clarifying which late fee provision applies.  The parties' briefing must

not include arguments pertaining to a reconsideration of Defendant's liability, or any

other issues that the Court has already decided in this Order.

### c.  Attorneys' Fees

The Court also orders further briefing from the parties about how the governing

SOW affects the amount of attorneys' fees Datalink is entitled.  If the StraTech SOW

controls, then Datalink is entitled reasonable attorneys' fees that resulted from Perkins

Eastman's breach.  (See Hoglund Dep., Ex. 22, "StraTech SOW" at PE_00319–320, ¶ D2

(stating that "Customer will . . .[pay] reasonable attorneys' fees" . . . for "any breach of

Customer's obligations hereunder") [Doc. No. 41-1].)  In contrast, if a Datalink SOW

governs, then the Terms and Conditions provide that Datalink is entitled to attorneys'

fees only if it prevails in arbitration.[9]  (See Rome Decl., Ex. S, "Datalink Terms and

Conditions" § 10 [Doc. No. 50-1].)

Additionally, if the governing SOW permits Datalink to collect attorneys' fees, the

Court also orders Plaintiff to submit briefing and an affidavit carefully documenting and

calculating reasonable attorneys' fees it believes it is due under the terms of the contract.

Defendant will have an opportunity to respond to Datalink's attorneys' fees calculation.

Therefore, the parties' briefing must also address how the controlling SOW affects the

amount of attorneys' fees Datalink is entitled to collect, if any at all.  The Court again

---

[9]     The Court expresses no opinion as to whether the attorneys' fees provision in the
Datalink SOWs could be interpreted to apply to parties that prevail in court, as well as via
arbitration.

emphasizes, however, that the parties' briefing must not engage with reconsideration on the merits of Defendant's liability.  As the Court clearly held above, regardless of which SOW applies, Defendant breached the contract between the parties.

### 5.  Defendant's Rescission Defense Fails

In opposition to Plaintiff's breach of contract claim, Perkins Eastman argues that it is entitled to the equitable remedy of rescission.  (See Def.'s Mem. at 5–9 [Doc. No. 46].) Specifically, Defendant contends that questions of material fact exist as to whether it rescinded its agreement with Plaintiff.  (See id. at 5.)  "Rescission is an equitable remedy which may be granted for a substantial breach of contract."  See Vill. of Wells v. Layne-Minn. Co., 60 N.W.2d 621, 625 (1953).  "The effect of the remedy of rescission is generally to so extinguish a rescinded contract so effectively that in contemplation of law it has never had existence."  Mead v. Mead, 974 F.2d 990, 992 (8th Cir. 1992) (quoting Chase Manhattan Bank, N.A. v. Clusiau Sales and Rental, Inc., 308 N.W.2d 490, 494 (Minn. 1981)); see also Johnny's, Inc. v. Njaka, 450 N.W.2d 166, 168 (Minn. Ct. App. 1990); Pioneer Indus., Inc. v. Hartford Fire Ins. Co., No. 07-cv-4421 (JNE/JJK), 2009 WL 2187379, at *12 (D. Minn. July 22, 2009).

According to the Minnesota Supreme Court, "[i]t is the general rule that a party seeking rescission must as a condition precedent return or offer to return that which he has received under the contract in order to restore the parties to the positions which they occupied prior to the transaction."  See Vill. of Wells, 60 N.W.2d at 625.  "Because the law favors the enforcement of contracts, a right to rescind arises only in circumstances

28

that may fairly be described as 'unusual.'" N.L.R.B. v. MEMC Elec. Materials, Inc., 363 F.3d 705, 709 (8th Cir. 2004).

Under Minnesota law, "[a] contract may be rescinded based on mutual mistake, mutual assent to rescission, a unilateral mistake induced by the other party, or a unilateral mistake where the contract can be rescinded without substantial hardship to the adverse party." Am. Litho, Inc. v. Imation Corp., No. 08-cv-5892 (JMR/SRN), 2010 WL 681275, at *3 (D. Minn. Feb. 23, 2010) (citing Gethsemane Lutheran Church v. Zacho, 104 N.W.2d 645, 649 (Minn. 1960); Lyon Financial Services, Inc. v. Hearyman, No. A08–1795, 2009 WL 1515598, at *5 (Minn. Ct. App. June 2, 2009); Gfrerer v. Lemcke, No. A08–0873, 2009 WL 749584, at *3 (Minn. Ct. App. March 24, 2009). "Generally, a party's own unilateral mistake is not a basis for rescission unless there is an ambiguity, fraud or misrepresentation by the other party." See Am. Litho, Inc., 2010 WL 681275, at *3. Nonetheless, a court may utilize its equitable power to "rescind a contract for a purely unilateral mistake of one contracting party not induced or contributed to by the other." See Gethsemane, 104 N.W.2d at 649.

However, the Minnesota Supreme Court explained in Gethsemane that "[r]elief from contractual obligations on grounds of unilateral mistake alone has been granted only [1] when enforcement would impose an oppressive burden on the one seeking rescission, and [2] when rescission would impose no substantial hardship on the one seeking enforcement." See id.

In this case, Defendant seeks to rescind the contract pursuant to the doctrine of unilateral mistake. Specifically, Perkins Eastman argues that Plaintiff should have

known that Lam did not have the actual or apparent authority to execute a contract on

behalf of Perkins Eastman.  For the reasons set forth below, the Court finds that

Defendant's rescission defense fails.

### a. Because Plaintiff Substantially Performed, Parties Cannot Be Placed in Pre-Contract Position

As the Court noted above, a principal goal of the rescission remedy is to place the

parties in a position that "they occupied prior to the transaction."  See Vill. of Wells, 60

N.W.2d at 625.  However, if one party to a contract has already "performed a substantial

part" of its obligations and cannot be placed in its pre-performance position, "the other

party cannot rescind."  See id. (citing Hunter v. Holmes, 62 N.W. 1131, 1132 (Minn.

1895)).

Given that the predominant purpose of the contract between the parties was the

sale of goods (see supra Part III(B)(4)), Plaintiff substantially performed its obligations

under the contract by delivering all goods related to the NBU Project.  (See Cockson

Decl., Ex. S, "Def.'s Resp. to Pl.'s Requests for Admission" at 3 [Doc. No. 41-19].)

Accordingly, Plaintiff asserts that as a "threshold matter, rescission is not available

because the parties cannot be returned to their pre-contract postures."  (Pl.'s Reply at 2

[Doc. No. 49].)  Plaintiff correctly states that the record shows that Datalink cannot be

returned to its original position because the NBU hardware is "not fungible."  (See id.)

The hardware is "highly customized technology equipment that depreciates rapidly, and

Symantec has refused to take it back."  (See id.)  John Sorensen, a Symantec employee,

informed Frank Giannelli, the General Manager of Datalink, that Symantec will not

refund the hardware.  (See Rome Decl., Ex. D, "Sorensen Email" [Doc. No. 50-1].)

Moreover, Datalink is prohibited from reselling the hardware to anyone other than

Perkins Eastman pursuant to the express terms of its Symantec partnership agreement.[10]

(See id., Ex. F, "Symantec Agreement" § 2.3(vi).)  Therefore, because Datalink cannot

recoup the costs of purchasing and re-selling the Symantec equipment, it cannot be

returned to its original pre-contract position; and thus, the primary goal of the rescission

remedy would not be met.

     The Court notes that although it does not appear that Datalink could be returned to

its original pre-contract position, the Minnesota Supreme Court has stated that the

substantial performance rule is "not inflexible and yields whenever under the

circumstances restitution is not essential to the complete administration of justice

between the parties."  See Vill. Of Wells, 60 N.W.2d at 625 (citing Darelius v.

Commonwealth Mortgage Co., 188 N.W. 208, 211 (Minn. 1922) (explaining that

"whenever, under the circumstances of the particular case, restitution by plaintiff is not

essential to the complete administration of justice between the parties, it will not be

required.  The rule goes no farther than justice requires.")).  Therefore, the Court

considers Defendant's other arguments about rescission below.

---

[10]     Even if Datalink could have resold the hardware, it is undisputed that the months-old appliances had little or no value.  (See Hoglund Dep. 74:11–75:8 [Doc. No. 41-1].)  In fact, Defendant independently confirmed that the hardware had little to no resale value.  Perkins Eastman President Hoglund testified in his deposition that the company was told that "the parts were worth maybe 10 to 20% what we paid for [them]."  (See id. at 74:18–75:6.)

**b.  Lam's Apparent Authority Negates Rescission Defense**

Defendant contends that "[a] *cursory* review of the record reveals that Plaintiff was on notice of the need to have someone other than Lam sign the purchase order." (See Def.'s Mem. at 6 (emphasis added) [Doc. No. 46].)  However, a *careful* review of the record reveals that even Defendant's own President admitted that Lam had apparent authority to execute the purchase orders.  (See Hoglund Decl. at 123:7–23 [Doc. No. 41-1].)

Under Minnesota law, "a principal is bound not only by the agent's actual authority but also by that which the principal has apparently delegated to him." McGee v. Breezy Point Estates, 166 N.W.2d 81, 89 (Minn. 1969); see Chavez-Lavagnino v. Motivation Educ. Training, Inc., 767 F.3d 744, 751 (8th Cir. 2014) (explaining that "[a]pparent authority in an organizational setting may . . . arise from the fact that a person occupies a type of position that customarily carries specific authority although the organization has withheld such authority from that agent.") (citations omitted)). "Whether an agent is clothed with apparent authority is a question of fact." Thesenga Land Co. v. Cirrus Warehouse, Inc., No. C5-03-370, 2003 WL 22889499, at *2 (Minn. Ct. App. Dec. 9, 2003) (citing Hagedorn v. Aid Ass'n for Lutherans, 211 N.W.2d 154, 157 (Minn. 1973)).  Apparent authority exists if: (1) the principal "held the agent out as having authority," or "knowingly permitted the agent to act on its behalf;" (2) "third parties . . . had actual knowledge that the agent was held out by the principal as having such authority or had been permitted by the principal to act on its behalf;" and (3) "proof of the agent[']s apparent authority [is] found in the conduct of the principal, not the

agent." Thesenga Land Co., 2003 WL 22889499, at *2 (citing Hockemeyer v. Pooler, 130 N.W.2d 367, 375 (Minn. 1964)).

Here, Defendant argues that a genuine issue of material fact exists as to the first element of the apparent authority test outlined above – whether Perkins Eastman held out Lam as having authority to execute the NBU Project contract.  Plaintiff contends that Perkins Eastman held Lam out as having authority by permitting Lam to negotiate the contract and configuration details between the parties.  Defendant points to one email, which it believes serves as evidence to the contrary.  Perkins Eastman argues that because Lam sent an email in March 2013 – several months after the December 27, 2012 Purchase Order was executed – and implied, through the phrasing of one question, that an agreement between the parties was not final, Plaintiff should have been on notice that Defendant was uncertain if it would need the NBU project.  (See Def.'s Mem. at 6 (citing Lam email which stated, "if we proceed with Symantec NBU") [Doc. No. 46].)

The Court finds that a single conditional precedent is not enough to create a genuine issue of material fact about the finality of the agreement between the parties.  On September 25, 2012, Kim Lam stated that he was "doing all necessary steps required to usher and secure a 'green light' to proceed, finance, and deploy[]" the NBU Project.  (See Hoglund Dep., Ex. 26 [Doc. No. 41-1].)  On December 27, 2012, Lam delivered to Datalink an executed, unqualified Purchase Order, stating, "please find this email as approved."  (See id. at 123:5–7; Ex. 31; see also Rome Decl., Ex. R, "Purchase Confirmation and Approval" [Doc. No. 50-1].)

The record also reflects that after December 2012, the parties continued to discuss

33

the details of how they intended to move forward with the NBU Project.  (See Ho Decl,

Ex. A, "Datalink Project Kickoff Presentation" (two hour presentation for technical

kickoff meeting that took place on Feb. 14, 2013) [Doc. No. 15-1]; Hoglund Dep., Ex. 32

(Feb. 7, 2013 emails scheduling the technical kickoff meeting); Ex. 33 (Feb. 13, 2013

email confirming the kickoff meeting); Ex. 34 (Feb. 12, 2013 email from Alan Ho,

Systems Director at Perkins Eastman, to John Aiello, a Datalink Account Executive,

requesting "the latest Visio of the design [of the NBU Project];" and a Feb. 13, 2013

email from Aiello to Ho, in which Aiello attached a summary of the hardware and

software configuration for the NBU Project); Ex. 39 (March 18, 2013 email from

Anthony Lee, an employee in the Information Technology Department at Perkins

Eastman, informing Aiello that he completed a pre-site configuration questionnaire in

order to provide Datalink with detailed confirmation specifications) [Doc. No. 41-1].)

Therefore, Lam's single inclusion of a condition precedent in one sentence in one

email exchange does not sufficiently demonstrate uncertainty about the definitiveness of

an agreement between the parties, nor does it substantiate a factual dispute about whether

Perkins Eastman held out Lam as having authority.

Defendant also argues that a genuine issue of fact exists as to the second element

of the Thesenga Land Co. apparent authority test – whether Plaintiff had actual

knowledge that Lam had apparent authority to execute contracts on behalf of Perkins

Eastman.  See Thesenga Land Co., 2003 WL 22889499, at *2.  Defendant contends that

because Aiello sent an internal email seeking information about the competitive

advantage of NBU as opposed to other options, Plaintiff knew or should have known that

34

the agreement between the parties was not final.  (See Def.'s Mem. at 7 [Doc. No. 46].)
The Court disagrees, and finds that no genuine issue of material fact exists about whether
Plaintiff believed that Lam had the apparent authority to execute a final agreement
between the parties.

Defendant claims that "there would be no reason for Plaintiff to look for this
[competitive advantage] information" if Defendant had already formally purchased the
NBU system.  (See Def.'s Mem. at 7 [Doc. No. 46].)  In response, Plaintiff argues that
"the date and plain language of the emails belie that claim."  (See Pl.'s Reply at 5 [Doc.
No. 49].)  The Court agrees with Plaintiff.  First, Perkins Eastman was the entity that
requested this competitive information *after* Datalink already performed.  In an email
sent on March 27, 2013, Lam asked Aiello for competitive information that would be
helpful for Perkins Eastman's upcoming merger with another company that uses a
different technology system.  (See Compl. at 64 [Doc. No. 1-1].)  By this date, Perkins
Eastman had already accepted the appliances and Datalink had rendered thirty hours of
professional services.  Furthermore, nothing in Lam's email may fairly be read as putting
Datalink on notice of Perkins Eastman's alleged unilateral mistake.  As Plaintiff explains,
"[t]hat Perkins Eastman would seek comparative information about the technology of an
acquisition target is neither unusual nor alarming.  The law does not charge Datalink with
decoding the hidden meaning of an otherwise routine email."  (See Pl.'s Reply at 5 [Doc.
No. 49].)

The Court also notes that Defendant argues that because it did not have the
opportunity to depose Aiello and ask him under oath whether he actually believed Lam

had apparent authority to negotiate on behalf of Perkins Eastman, a disputed issue of fact remains.  (See Def.'s Mem. at 7 [Doc. No. 46].)  The Court disagrees.  Defendant cannot "rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.  Perkins Eastman "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." Briscoe v. Cnty. of St. Louis, Mo., 690 F.3d 1004, 1011 (8th Cir. 2012) (internal quotations and citations omitted); see also Gibson v. Am. Greetings Corp., 670 F.3d 844, 853 (8th Cir. 2012) (same).  Here, Perkins Eastman merely rests on the possibility that Aiello's testimony under oath would contradict the substantial, existing evidence in the record.  Thus, Defendant fails to present specific facts showing a genuine issue for trial.

Moreover, the Court notes that the President of Perkins Eastman admitted during his deposition testimony that after receiving the signed December 27, 2012 Purchase Order, Datalink likely "would not have expected that there was anything further" to obtain by way of approvals.  (See Hoglund Dep. 122:21–123:23 [Doc. No. 41-1].)  In other words, as Plaintiff explains, "Perkins Eastman agrees that it was reasonable for Datalink to take Kim Lam at his word—that he did, in fact, take all of the 'necessary steps' to obtain approval and, by December 27, 2012, had the authority to communicate that approval."  (See Pl.'s Reply at 5 [Doc. No. 49].)  Accordingly, the Court holds that no genuine issue of material fact exists as to whether Lam had apparent authority to

execute a contract on behalf of Perkins Eastman.[11]

### c.   Defendant Would Not Be Oppressively Burdened If Contract Was Enforced; But Rescission Would Cause Plaintiff Substantial Hardship

As noted above, in order for Perkins Eastman to succeed with its rescission defense based on unilateral mistake, it must show the existence of two conditions. See Gethsemane, 104 N.W.2d at 649.  First, Defendant must demonstrate that enforcing the contract "would impose an oppressive burden" on Perkins Eastman.  See id.; see also Am. Litho, Inc., 2010 WL 681275, at *3.  Second, Defendant must show that rescission would "impose no substantial hardship" on Datalink.  See Gethsemane, 104 N.W.2d at 649; see Am Litho, Inc., 2010 WL 681275, at *3.

Defendant is silent on the subject of whether enforcing the contract would impose an oppressive burden on Perkins Eastman.  Therefore, Perkins Eastman fails to show the first condition required to prove rescission on the basis of a unilateral mistake.

Similarly, Perkins Eastman also fails to show the second requisite condition – that rescission would not impose substantial hardship on Datalink.  In fact, the record

---

[11]   Plaintiff sufficiently presents evidence demonstrating the existence of the third, and final, element of the apparent authority test outlined in Thesenga Land Co.  For instance, according to the record before the Court, proof of Lam's apparent authority is evident in the conduct of other Perkins Eastman employees, who were aware of Lam's negotiations and the contract deal and did not intervene.  (See, e.g., Hoglund Dep. 14:13–15:5, 19:1–10, 20–21, 54:3–13 (Lam would update Hoglund about the NBU Project); id., Ex. 33 (Feb. 13, 2013, email from Alan Ho, Senior Associate at Perkins Eastman, to several Perkins Eastman employees confirming their availability for an NBU Project meeting and informing them that that they will need "to start working on this questionnaire after tomorrow's meeting."); Ex. 32 (Feb. 7, 2013, email from Aiello to Alan Ho and others).)  Defendant does not appear to argue that a genuine issue of material fact exists for the third element of the apparent authority test.  Therefore, the Court finds that the factual basis supporting the existence of this element is not disputed.

overwhelmingly demonstrates that rescission *would* impose a substantial hardship on Datalink.  The undisputed record shows the following: Datalink paid Symantec for the NBU Project equipment (see Westenfield Dep. 56:19 –57:1 [Doc. No. 50-1]); Perkins Eastman has not paid Datalink for the equipment (see Def.'s Mem. at 5 [Doc. No. 46]); the Datalink-Symantec agreement prohibits Datalink from reselling the hardware (Rome Decl., Ex. F, "Symantec Agreement" § 2.3(vi) [Doc. No. 50-1]; Westenfield Dep. 100:4–19 [Doc. No. 41-2]); Symantec would not refund the hardware (Rome Decl. Ex. D, "Sorensen Email" [Doc. No. 50-1]); and the NBU Project hardware is worth – *at most* – ten to twenty cents on the dollar (Hoglund Dep. 74:11–75:8 [Doc. No. 41-1]; Cockson Decl., Ex. V, "Missling Correspondence" [Doc. No. 41-22]).  Thus, the record establishes that rescission would cause Datalink substantial hardship because it would remain uncompensated for the goods it provided and services it rendered.

Defendant claims that "[t]he fact issue of whether Plaintiff sustained 'substantial hardship' from a rescission is highlighted by the fact that Plaintiff was able to return 100% of the software it had sold to Defendant back to Symantec."  (See Def.'s Mem. at 8 [Doc. No. 46].)  The Court disagrees.  Simply because Symantec was willing to accept the returned software does not indicate that Datalink did not suffer a loss of profit from the software, or that Symantec is willing to accept returned hardware.  In fact, the record demonstrates the exact opposite.  Symantec has affirmatively stated that it will not accept the NBU hardware currently in Defendant's possession.  (See Rome Decl. Ex. D, "Sorensen Email" [Doc. No. 50-1].)  Therefore, it is undisputed that Datalink would suffer substantial hardship if the Court permitted rescission.

Therefore, Defendant fails to meet the requisite standard of proof to survive summary judgment with its rescission defense to Plaintiff's breach of contract claim. Accordingly, the Court grants Plaintiff's motion with respect to Defendant's liability for Plaintiff's Count I.

### C. Count II: Unjust Enrichment

Because the Court finds that a binding contract existed between the parties, and Defendant breached this contract, the Court need not reach the merits of Plaintiff's unjust enrichment claim.

### IV. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff's Motion for Summary Judgment [Doc. No. 38] is **GRANTED, in part**, consistent with this Order.

2. Solely in order to guide the Court's analysis about which late fee applies to Plaintiff's damages, and the amount of attorneys' fees Plaintiff is entitled, the parties must submit briefing on the following issues: (1) which statement of work ("SOW") governs the contractual relationship at issue in this case – either the StraTech SOW or one of the Datalink SOWs; (2) which "applicable" state law controls in this case for calculating late fees due under the contract; (3) which appropriate late fee to apply (whether the 1.5% rate set out in the contract, *or* the "highest rate permitted by applicable law"); (4) the ultimate damages award that results from the appropriately applied late fee; and (5) attorneys' fees due under the terms of the governing SOW.
   a. Plaintiff must submit its briefing by or before two weeks from the date of this Order.
   b. Defendant must submit its response brief by or before three weeks from the date of this Order.

Dated:  June 8, 2015                          s/Susan Richard Nelson
                                              SUSAN RICHARD NELSON
                                              United States District Judge

39