**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Datalink Corporation,<br><br>Plaintiff,<br><br>v.<br><br>Perkins Eastman Architects, P.C.,<br><br>Defendant. | Case No. 13-cv-2978 (SRN/HB)<br><br>**MEMORANDUM OPINION AND ORDER** |

Amanda J. Rome, Michael F. Cockson, and Staci L. Perdue, Faegre Baker Daniels LLP, 90 South 7th Street, Suite 2200, Minneapolis, MN 55402-3901, for Plaintiff.

Kyle A. Eidsness and Douglas J. McIntyre, Foley & Mansfield, PLLP, 250 Marquette Ave, Suite 1200, Minneapolis, MN 55401, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I. INTRODUCTION

In this Court's June 8, 2015 Order ("June 8 Order"), the Court directed the parties to submit briefing on the following issues:

> (1) which statement of work ("SOW") governs the contractual relationship at issue in this case – either the StraTech SOW or one of the Datalink SOWs; (2) which "applicable" state law controls in this case for calculating late fees due under the contract; (3) which appropriate late fee to apply (whether the 1.5% rate set out in the contract, *or* the "highest rate permitted by applicable law"); (4) the ultimate damages award that results from the appropriately applied late fee; and (5) attorneys' fees due under the terms of the governing SOW.

(6/8/15 Order at 39 [Doc. No. 53].) Plaintiff Datalink Corporation ("Plaintiff" or "Datalink") duly filed its Supplemental Memorandum in Support of its Motion for

Summary Judgment on June 22, 2015 [Doc. No. 54]. Defendant Perkins Eastman Architects, P.C. ("Defendant" or "Perkins Eastman") filed its response brief on June 29, 2015 [Doc. No. 58]. For the reasons set forth below, the Court finds that the Datalink SOW governs. Accordingly, the Court holds that Plaintiff is entitled to $80,944.05 in late fees, but is not entitled to attorneys' fees.

## II. BACKGROUND

### A. Contract and Governing SOW

In its June 8 Order, the Court held that the December 27, 2012, NetBackup ("NBU") Project Purchase Order, which Kim Lam signed on behalf of Perkins Eastman, serves as the unambiguous contract between the parties. (6/8/15 Order at 8 [Doc. No. 53].) The Purchase Order was drafted by Perkins Eastman, as evidenced by Defendant's letter head at the top of the document. (McIntyre Decl., Ex. A, "Purchase Order" [Doc. No. 59-1].) Based on the parties' initial briefing it appeared to the Court that the reference to "SOW #14" in the Purchase Order constituted a reference to the original StraTech SOW. (See 6/8/15 Order at 8 [Doc. No. 53]; McIntyre Decl., Ex. A, "Purchase Order" [Doc. No. 59-1].)[1] Thus, the Court believed that the contract incorporated the StraTech SOW.

Once Datalink acquired StraTech and began to work directly with Perkins Eastman, the parties created four successive, updated versions of the SOW. (See Rome Decl., Exs. G, H, I, J "Datalink SOWs" [Doc. No. 50-1].) Each of these versions of the

---

[1] Since StraTech was the initial corporation that began working with Perkins Eastman on the NBU Project, the first SOW was created by StraTech, and has been referred to as the "StraTech SOW."

SOW, however, did not at all alter the NBU Project hardware and software requirements. Rather, the Datalink SOWs only fine-tuned the service component of the NBU Project. (See generally id.)

Without adequate briefing on the subject, the Court could not determine which SOW governed the parties' agreement. Based on the exhibits and briefing originally filed, it appeared that the Purchase Order explicitly incorporated the StraTech SOW, but it was unclear if the successive Datalink SOWs adequately modified the parties' agreement. Accordingly, the Court ordered supplemental briefing in order to determine which SOW governed, and the amount, if any, of late fees and attorneys' fees that were due.

**B. Judgment Modification**

The Court also notes that although it held in its June 8 Order that Plaintiff is entitled to a judgment of $402,868.23 – the amount it would have received had Perkins Eastman performed, not including the Symantec software credit – the judgment must be modified. (6/8/15 Order at 16, 23 [Doc. No. 53].) The Court did not include the value ($7,734.88) of the thirty hours of professional services rendered by Datalink for Perkins Eastman in the total sum of the judgment because it assumed, based on the parties' briefing, that Perkins Eastman had already paid this value, or intended to pay this value. (See Pl.'s Reply at 13 [Doc. No. 49].) Datalink now informs the Court that neither of these assumptions is correct. Therefore, the Court amends it prior Order and finds that Plaintiff is entitled to $410,603.11 – the sum of the value of services rendered ($7,734.88), the profit on the software that was returned to Symantec ($72,835.01), and

the contract price of the hardware accepted by Perkins Eastman, including taxes and freight ($330,033.22). (See Pl.'s Mem. at 14–15 [Doc. No. 40].)

## III. DISCUSSION

The parties disagree about which SOW governs their contractual relationship. Plaintiff contends that the StraTech SOW governs because none of the successive Datalink SOWs adequately modified the agreement. (See Pl.'s Supp. Mem. at 1 [Doc. No. 54].) In contrast, Defendant argues that a Datalink SOW governs because the signed Purchase Order actually incorporated a Datalink SOW, *not* the StraTech SOW; and therefore, it is immaterial if the Datalink SOWs modified the StraTech SOW. (See Def.'s Supp. Mem. at 5 [Doc. No. 58].) In support of this argument, Perkins Eastman relies heavily upon one new document that it filed with the Court – a Datalink quote that was created on December 20, 2012, and itemizes the costs of the various components of the NBU Project. (See McIntyre Decl., Ex. B, "Datalink Quote" [Doc. No. 59-2].) Defendant also bolsters its argument by detailing the similarity between the executed Purchase Order and the Datalink SOWs.[2]

Minnesota law follows the objective theory of contract formation, requiring an outward manifestation of assent to form a contract. See Markmann v. H.A. Bruntjen Co., 81 N.W.2d 858, 862 (Minn. 1957); Cederstrand v. Lutheran Bhd., 117 N.W.2d 213, 221 (Minn. 1962) (explaining that "[e]xpressions of mutual assent, by words or conduct, must

[2] When the parties initially submitted briefing at summary judgment, neither party provided such a detailed comparison, or any substantial comparison at all, between the Purchase Order and the various SOWs. Therefore, the Court did not have the benefit of these comparisons when it initially noted in its June 8 Order that the StraTech SOW appeared to be incorporated into the Purchase Order.

be judged objectively, not subjectively.") Thus, in order to determine which SOW governs, the Court must decide whether the parties' objective mutual assent is sufficiently demonstrated by (1) Defendant's newly produced document, the Datalink quote, and (2) similarities between the Purchase Order and the Datalink SOWs.

**A. Datalink SOW Governs**

The Court finds that the Datalink SOW governs. Specifically, the Court holds that the newly filed evidence coupled with the written contract terms of the Purchase Order demonstrate that the parties objectively mutually assented to the terms of the Datalink SOW. Therefore, the Court need not determine whether the Datalink SOWs adequately modified the StraTech SOW.

The Purchase Order states that the cost of "Professional Services NBU/Appl SOW #14" is $46,750, and the cost of "Travel expenses – TBD #15" is $2,000.[3] (See McIntyre Decl., Ex. A, "Purchase Order" [Doc. No. 59-1].) Although based on the parties' initial briefing the Court believed that the Purchase Order's reference to "Professional Services NBU/Appl SOW #14" was a reference to the StraTech SOW, new exhibits filed with the Court demonstrate that the "SOW #14" notation is most likely a reference to a Datalink SOW and the December 20, 2012 Datalink quote.

By the time the Purchase Order was executed on December 27, 2012, the parties had already created at least two versions of a Datalink SOW – one that was initially dated

[3] As an initial matter, the Court notes that although the parties created successive versions of the SOW after the creation of the StraTech SOW, these new versions did not alter the NBU Project hardware and software requirements. (See 6/8/15 Order at 9 [Doc. No. 53].) Therefore, the Court pays most careful attention to the other components of the project – particularly the services rendered and expected travel expenses.

December 14, 2012 and included redline changes ("Redlined Datalink SOW 2.0"), and another that was dated December 26, 2012 ("Datalink SOW 3.0"). (See McIntyre Decl., Ex. C, "Redlined Datalink SOW 2.0" [Doc. No. 59-3]; id., Ex. D, "Datalink SOW 3.0" [Doc. No. 59-4].) These two versions of the SOW are substantially similar. In fact, in Datalink SOW 3.0, Plaintiff appears to have simply accepted all of the proposed changes in Redlined Datalink SOW 2.0.

The proposed changes in Redlined Datalink SOW 2.0 included: edits to the date of the SOW (changed from December 14, 2012 to December 26, 2012); edits to the section numbering in the document; and additions of some sentences to clarify the scope of the project and the responsibilities of the parties. (See generally McIntyre Decl., Ex. C, "Redlined Datalink SOW 2.0" [Doc. No. 59-3].) One sentence that was added stated that "[e]stimated [travel and expenses] for this statement of work is $2,000." (See id. §§ 6.3, 6.7.) Most significantly, Datalink's services fee was also changed from an "estimated professional services" fee of $36,544, to a fixed fee of $46,750. (See id. §§ 6.1, 6.7.)

Likely in an effort to formally accept all of the proposed edits in the Redlined Datalink SOW 2.0, Datalink created another version of the SOW that was dated December 26, 2012, and was labeled Revision 3.0 ("Datalink SOW 3.0"). (See McIntyre Decl., Ex. D, "Datalink SOW 3.0" [Doc. No. 59-4].) Like the Redlined Datalink SOW 2.0, the Datalink SOW 3.0 also listed the estimated travel and expenses fee as $2,000, and listed $46,750 as the fixed fee for services. (See id. §§ 6.1, 6.3, 6.7.) Therefore, for all intents and purposes, these two versions of the Datalink SOW are the same, and the Court refers to them collectively as "the Datalink SOW."

In addition to filing these two versions of the Datalink SOW with its supplemental briefing, Defendant newly filed a Datalink quote ("Quote") that was created on December 20, 2012 and expired on December 27, 2012. (See McIntyre Decl., Ex. B, "Datalink Quote" [Doc. No. 59-2].) The Quote itemizes the cost of each NBU Project component and also includes a "Grand Total" price for the NBU Project. (See id.) Line 15 of the Quote lists the cost for "Travel expenses" as $2,000, and cautions the reader that this cost is only the "initial estimate, actual to be billed." (Id.) Line 14 of the Quote lists the cost for "Professional Services, NBU/Appliance implementation" as $46,750, and instructs the reader to see the "SOW for details." (Id.) Although the Quote does not expressly state *which* SOW should be referenced "for details," Defendant aptly notes that the cost of professional services and travel expenses detailed in the Quote mirrors the cost of professional services and travel expenses that were included in the Datalink SOW.

The costs of "Professional Services" and "Travel expenses" that are listed in the Quote and the Datalink SOW discussed above, are precisely the same values as those listed in the executed Purchase Order. For instance, the Purchase Order states that the cost of "Professional Services NBU" is $46,750, and references "Appl SOW #14," which is most likely a reference to line 14 of the Quote that lists the same price for Plaintiff's professional services. (See McIntyre Decl., Ex. A, "Purchase Order" [Doc. No. 59-1].) The Purchase Order also lists the cost of "Travel expenses" as $2,000, and references "TBD #15," which is most likely a reference to line 15 of the Quote that cautioned that the value of $2,000 for travel expenses was merely an estimate. (See id.) Furthermore, the Purchase Order includes three references to the following Datalink Quote Number:

1128066567v3. (See id.) This number corresponds with the identification number located at the top left corner of the Quote. (See McIntyre Decl., Ex. B, "Datalink Quote" [Doc. No. 59-2].) Additionally, the Court notes that Defendant executed the Purchase Order on December 27, 2012, which was the final day that Plaintiff's Quote was valid. (See id.; id., Ex. A, "Purchase Order.")

Given that the Purchase Order explicitly references the identification number of the Datalink Quote three times, and lists the same values for professional services and travel expenses that are listed in the Datalink Quote and the Datalink SOW, the Court finds that the controlling SOW is the Datalink SOW. By drafting and signing a Purchase Order that included all of these references to the Datalink SOW, Perkins Eastman objectively expressed its assent to the terms of the Datalink SOW. Similarly, by drafting the Datalink SOW, Plaintiff also expressed its assent to the terms of its SOW. Therefore, the parties' words and conduct contain expressions of objective mutual assent to the Datalink SOW. See Markmann, 81 N.W.2d at 862.

In contrast to the precise overlap in terms and costs that exists between the Datalink SOW and the Purchase Order, such a similarity in terms does not exist between the Purchase Order and the StraTech SOW. For instance, whereas the Purchase Order lists the cost for professional services as $46,750, the StraTech SOW calls for $35,544 in professional services fees that "will be rendered on a Time and Materials (T&M) basis," and for which Perkins Eastman "will be invoiced for all actual time worked on an hourly basis at the" rate of $187.50 per hour. (See McIntyre Decl., Ex. E, "StraTech SOW" at 7 [Doc. No. 59-5].) Also, although the Purchase Order lists the cost for travel expenses as

$2,000, the StraTech SOW does not even include an estimated cost for expected travel expenses. Moreover, the Court notes that the StraTech SOW provided that, "[i]n the event that this Statement of Work . . . [was] not signed by Customer [Perkins Eastman] and submitted to StraTech for execution within sixty (60) days from the date of issue (September 18, 2012), StraTech's offer to perform the Services [was] null and void." (See id. at 9.) Thus, Perkins Eastman failed to accept the StraTech SOW because it did not execute the Purchase Order within sixty days of September 18, 2012. (See McIntyre Decl., Ex. A, "Purchase Order" (executed on December 27, 2012) [Doc. No. 59-1].)[4] Therefore, the Court finds that the Purchase Order must have necessarily incorporated the terms of the Datalink SOW, and the Datalink SOW governs the terms of the parties' agreement.[5]

---

[4] Under both Minnesota and North Carolina state law, an offer cannot be accepted after the deadline for accepting the offer has expired. Starlite Ltd. P'ship v. Landry's Restaurants, Inc., 780 N.W.2d 396, 399 (Minn. Ct. App. 2010) ("Minnesota caselaw recognizes that when an offer specifies a deadline for acceptance and that time passes, the offeree's power to accept lapses and an offeree's late acceptance cannot create a contract."); Se. Coastal Dev. Fund, L.L.C. v. Commercial Real Estate Inc., No. 5:08-CV-15-F, 2009 WL 928543, at *7 (E.D.N.C. Apr. 3, 2009) (explaining that under North Carolina law, an "'offer may specify in it the time within which acceptance must occur; if it does, the power of acceptance is limited accordingly.'") (quoting 1 Arthur Linton Corbin, Corbin on Contracts § 2.14 (Rev. Ed. 2008)).

[5] The Court holds that although this new ruling differs from its previous observation that the Purchase Order appeared to explicitly incorporate the StraTech SOW, the new ruling does not alter its previous finding that Defendant is liable for breaching the contract. The Purchase Order remains unequivocal evidence that the parties formed a contract; Plaintiff clearly performed the conditions precedent; Defendant unmistakably breached the contract by not paying the invoices; and damages resulted from Defendant's breach. Rather, the Court's ruling is merely updated to reflect the effect of newly filed documents and additional briefing submitted by the parties.

**B. Interest/Late Charges Datalink is Entitled**

Because the Datalink SOW governs the terms of the parties' agreement, Plaintiff is entitled to late fees pursuant to the terms outlined in the Datalink SOW. Each version of the Datalink SOW incorporates Terms and Conditions (see Rome Decl., Exs. G, H, I, J "Datalink SOWs" at 2 (Confidentiality Statement) [Doc. No. 50-1]) that include a late fee provision, which states that "Datalink reserves the right to charge a late payment charge not to exceed one and one-half percent (1.5%) per month or the maximum amount permitted by [Minnesota] law, whichever is less, on all invoices that remain unpaid thirty (30) days from invoice due date." (See Rome Decl., Ex. S, "Datalink Terms and Conditions" §§ 3, 14 [Doc. No. 50-1].) Therefore, Datalink is entitled to the lesser of: (1) 1.5% per month, or (2) the maximum amount permitted by Minnesota law.

Under Minnesota law, the "interest on pecuniary damages shall be computed . . . from the time of the commencement of the action . . . or the time of a written notice of claim, whichever occurs first." Minn. Stat. § 549.09(b) (2015). Here, Datalink satisfied the written notice of claim requirement when it sent invoices to Perkins Eastman for the NBU Project. Accordingly, the interest to which Plaintiff may be entitled under Minnesota law must be computed from the time that the invoices were sent.

Minnesota law also provides the interest rate(s) that apply when calculating the applicable late fees. "For a judgment or award over $50,000 . . . the interest rate shall be ten percent per year until paid." Id. § 549.09(c)(2) (2015). However, "[f]or a judgment or award of $50,000 or less. . . [t]he rate of interest shall be" 4%. Id. § 549.09(c)(1); (McIntyre Decl., Ex. H "2015 Interest Rates on State Court Judgments and Arbitration

Awards" [Doc. No. 59-8].)

Datalink seeks to apply Minnesota's statutory rate of 10% per year to each of the eight invoices that comprise the judgment that Plaintiff is due ($410,603.11). (See Perdue Decl., Ex. B [Doc. No. 56].) However, Perkins Eastman contends that the Court should apply a different interest rate based on the individual value of each invoice. For instance, Defendant claims that the Court should apply a 10% interest rate to the two individual invoices for over $50,000, but should apply the 4% interest rate to the six other invoices that individually bill Defendant less than $50,000. (See Def.'s Supp. Mem. at 18 [Doc. No. 58].)

Defendants cites Alpine Glass, Inc. v. American Family Insurance Co., No. 06-cv-4213 (DSD/SRN), 2010 WL 5088188, at *4 (D. Minn. Dec. 7, 2010), for the proposition that it is an error to aggregate claims and apply a 10% interest rate to the entire sum, when calculating the interest that a plaintiff is due under Minn. Stat. § 549.09. In Alpine Glass, the plaintiff installed glass for the defendant's customers, who then assigned their individual claims to the plaintiff. See 2010 WL 5088188, at *1. An arbitrator awarded damages on the claims and assessed interest under § 549.09 to the total aggregated award. Id. at *4. The federal district court held that assessing the interest based on the total aggregated award was improper because "each claim remained an individual claim in consolidation." Id. Thus, the Alpine Glass Court modified the interest assessed by the arbitrator and applied the 4% interest rate that was proper for claims under $50,000. See id. In Garlyn, Inc. v. Auto-Owners Insurance Co., the Minnesota Court of Appeals similarly held that individual claims that were assigned to the plaintiff could not be

aggregated in order to determine the interest that the plaintiff was due under § 549.09. See 814 N.W.2d 709, 715 (Minn. Ct. App. 2012).

In In re Estate of Rutt, the Minnesota Court of Appeals distinguished both Alpine Glass and Garlyn. See 824 N.W.2d 641, 646–47 (Minn. Ct. App. 2012). The Rutt Court explained that cases such Alpine Glass and Garlyn, which involve a "lump-sum judgment based on the individual claims of different parties that were later assigned and consolidated," are "material[ly] differen[t]" from cases in which the judgment consists of multiple claims on behalf of one party. See id. at 647. The Minnesota Court of Appeals noted that the language of the statute is consistent with this distinction, since "[s]ection 549.09 does not indicate that the $50,000 threshold must be met by individual claims, it merely requires that the 'judgment or award [be] over $50,000" in order for a 10% interest rate to apply. Id. For that reason, the Rutt Court determined that the lower court had properly applied the 10% interest rate to the plaintiff's judgment, which was based on "three underlying transactions." Id.

The Court finds that this case is similar to In re Rutt in that Datalink's judgment is based on multiple unpaid invoices, which Datalink billed Perkins Eastman. Plaintiff's judgment is not the aggregate sum of consolidated and assigned claims that initially arose from multiple parties. Cf. Alpine Glass, 2010 WL 5088188, at *1, *4; Garlyn, 814 N.W.2d at 715. Therefore, the Court holds that when determining the potential late fees that Plaintiff is due under Minnesota law, it is appropriate to consider the total judgment ($410,603.11), as opposed to assessing each invoice individually.

Applying Minnesota's statutory rate of 10% per year, Datalink is entitled to

$80,944.05 in late fees. (See Perdue Decl., Ex. B [Doc. No. 56].) Conversely, using the contractual rate of 1.5% per month, Datalink is entitled to $145,690.78 in late fees. (See id.) Because the Datalink SOW provides that Plaintiff may collect the lesser of 1.5% per month in late charges, or the maximum late fees permitted by Minnesota law, the Court holds that Datalink is entitled to $80,944.05 in late fees.

**C. Attorneys' Fees**

"Ordinarily, a party may not recover attorney fees unless a statute or contract provision expressly allows such recovery." State Bank of Cokato v. Ziehwein, 510 N.W.2d 268, 270 (Minn. Ct. App. 1994) (citing Barr/Nelson, Inc. v. Tonto's, Inc., 336 N.W.2d 46, 53 (Minn. 1983); Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 263–64 (1975) (explaining that without statutory authorization or a contractual agreement between the parties, the American rule provides that each party in federal litigation must pay its own attorneys' fees). Plaintiff contends that the Datalink SOW authorizes it to recover reasonable attorneys' fees. (See Pl.'s Supp. Mem. at 8 [Doc. No. 54].) Specifically, Datalink argues that because the Datalink SOW expressly authorizes an arbitrator to award attorneys' fees to the prevailing party, the contract "reflects the parties' intent to give the decision-maker[, including the Court,] the authority to award fees." (See id. at 9.) In opposition, Perkins Eastman claims that Datalink "waived any right to fees which would be awarded in an arbitration setting from an arbitrator by its unilateral choice of a different forum." (See Def.'s Supp. Mem. at 8 [Doc. No. 58].) The Court agrees.

The Datalink SOW contains the following provision:

> 10. **ARBITRATION** Any controversy or claim arising out of or relating to this contract, or breach thereof, shall be settled by arbitration administrated by the American Arbitration Association in accordance with its commercial arbitration rules and judgment upon the award rendered by the arbitrator may be entered in any court having competent jurisdiction thereof. The arbitrator is specifically empowered with the authority to award costs including attorney's fees to the prevailing party. Any such arbitration will be conducted in Minneapolis, Minnesota.

(McIntyre Decl., Ex. G "Datalink Terms and Conditions" § 10 (emphasis added) [Doc. No. 59-7].) Thus, the plain language of the contract permits an arbitrator to award reasonable attorney fees to the prevailing party. (Id.) However, the contract is silent with respect to whether a court may grant attorneys' fees. See Riniker v. UnitedHealth Group Inc., No. 12-cv-2875 (JNE/TNL), 2015 WL 1782566, at *8 (D. Minn. Apr. 20, 2015) (denying defendants' request for attorney's fees "[b]ecause the FAA, the parties' arbitration agreement, and the statutes supporting the underlying claims [did] not [affirmatively] authorize [the] court to award attorneys' fees"). By waiving their right to arbitrate this dispute, the parties did not implicitly create positive authorization for this Court to award attorneys' fees. Accordingly, the Court finds that Datalink is not entitled to attorneys' fees.

Plaintiff's effort to equivocate the "Arbitration" provision in the Datalink SOW into a general "prevailing party in litigation" provision fails. The two cases that Datalink cites in support of its argument for attorneys' fees, (1) Harris v. Sandro, 96 Cal. App. 4th 1310 (Cal. Ct. App. 2002) and (2) Argus Development, Inc. v. Govern, No. C9-94-654, 1994 WL 411599 (Minn. Ct. App. Aug. 9, 1994),

are in fact inapposite. In Harris, a California state appellate court held that where "a contract both compels arbitration and awards attorney's fees to the prevailing party in 'litigation' arising out of the contract, the attorneys' fee provision applies to the arbitration." See 96 Cal. App. 4th at 1314. As Defendant explains, in Harris, "the agreement provided for both arbitration and attorneys' fees, but did not tie the right to recover attorneys' fees to use of an arbitration forum." (See Def.'s Supp. Mem. at 9–10 [Doc. No. 58].) Therefore, the court held that the arbitrator was entitled to award attorneys' fees. See Harris, 96 Cal. App. 4th at 1315.

Similarly, in Argus Development, Inc., the Minnesota Court of Appeals held that the lower court did not err in permitting an arbitrator to determine the amount of attorneys' fees that the plaintiff was entitled, even though the contract empowered "the court" to award attorneys' fees. See 1994 WL 411599, at *2. The court explained that "[b]ecause all controversies arising out of the joint venture agreement must be resolved by arbitration, the amount of this award was properly left to the arbitrator." See id. Any other result would necessarily render the attorneys' fee clause meaningless.

In contrast, here, the Datalink SOW does not simultaneously mandate arbitration while only permitting a court to grant attorneys' fees. Rather, the Datalink SOW expressly provides that *only* an arbitrator may award attorneys' fees. Plaintiff may not rely on the "Arbitration" clause in the Datalink SOW to argue that the Court may award attorneys' fees. The attorneys' fee portion of the contract is

inseparable from the agreement's "Arbitration" clause. Therefore, Harris and Argus Development, Inc. are distinguishable. Because the "Arbitration" clause of the Datalink SOW unambiguously prohibits the Court from awarding attorneys' fees, Plaintiff's request for fees is denied.[6]

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Court's June 8, 2015 Order is amended to reflect that Defendant must pay Plaintiff the sum of the value of services rendered ($7,734.88), the profit on the software that was returned to Symantec ($72,835.01), and the contract price of the hardware accepted by Perkins Eastman, including taxes and freight ($330,033.22), for a total of $410,603.11.

2. Defendant must pay Plaintiff a total of $80,944.05 in late charges.

3. Plaintiff is not entitled to attorneys' fees.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 10, 2015

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge

[6] Additionally, the Court notes that even if the Arbitration clause of the contract was ambiguous, then the Court would still find that the clause does not permit the Court to grant Plaintiff attorneys' fees. Under Minnesota law, if a contract clause is ambiguous, the Court must construe the contract against the drafter, which in this instance is Datalink. See Current Technology Concepts, Inc. v. Irie Enters., Inc., 530 N.W.2d 539, 543 (Minn. 1995) (explaining that (1) a contract is ambiguous if its language is reasonably susceptible to multiple interpretations; and (2) an ambiguous contract is construed against the drafter in the absence of a clear showing that the parties intended a contrary meaning). Therefore, insofar as Plaintiff contends that the "Arbitration" clause is ambiguous and thus may empower the Court to award attorneys' fees, the Court finds that this argument fails.